STEVEN KALAR
Federal Public Defender
DANIEL P. BLANK
Senior Litigator
450 Golden Gate Avenue
San Francisco, California  94102
Telephone:   (415) 436-7700
Facsimile:    (415) 436-7706
Email:          Daniel_Blank@fd.org

Counsel for Defendant PIPPERT

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR 17-0563 VC |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | Court:    Hon. Vince Chhabria |
| DOUGLAS PIPPERT, | Date:     October 2, 2018 |
| Defendant. | Time:     10:30 a.m. |

**ARGUMENT**

Consistent with the plea agreement, the U.S. Probation Office's Presentence Report calculates a total offense level under the U.S. Sentencing Guidelines of 35, resulting from Defendant Douglas Pippert's guilty plea to Production of Child Pornography in violation of 18 U.S.C. § 2251(a), which carries a mandatory minimum sentence of 15 years imprisonment.[1] Due to his state court conviction in 2016 deriving from the same investigation and course of conduct as charged here in federal court, the PSR places Mr. Pippert in Criminal History Category III, resulting in an advisory guideline range of 210 to 262 months, and recommends a sentence of 210 months. Based upon a combination of factors under 18 U.S.C. § 3553(a) – including the prolonged sexual abuse suffered by Mr. Pippert as a child, his low risk of recidivism, and the fact that he has already been prosecuted and served a sentence of 32 months imprisonment in state court for the same course of conduct – undersigned counsel respectfully submits that a downward variance to a sentence of 180 months is warranted.

**I. PIPPERT SUFFERED PROLONGED SEXUAL ABUSE AS A CHILD**

Mr. Pippert has accepted full responsibility for the serious offenses that he committed in this case, unconditionally pleading guilty to them in both state and federal court. Sadly, and predictably, Mr. Pippert was himself the victim of prolonged sexual abuse – including repeated oral and anal rape – over a period of years when he was a child. *See* PSR ¶¶ 48-57; *see also* Psychological Evaluation by Dr. Scott Lines (forwarded to the Court by the U.S. Probation Officer) [hereinafter "Lines Report"] at 4-8. While this fact in no way excuses Mr. Pippert's criminal conduct here, it does place that conduct in an important context, especially as it relates to the risk of recidivism in the future.

---

[1] As stipulated in the plea agreement, "[b]eginning on a date unknown and continuing until at least March 12, 2016, in the Northern District of California, [Mr. Pippert] knowingly used a minor, J.H., to take part in sexually explicit conduct." Docket #16 (filed June 19, 2018). "During this time, J.H. had attained the age of 12, but not 16 years, and J.H. would often stay at [Mr. Pippert's] residence." *Id.* While there, Mr. Pippert "engaged in sexually explicit conduct with J.H., while J.H. was both conscious and unconscious, and [Mr. Pippert] made visual images of this sexually explicit conduct with J.H." *Id.* The full course of conduct is set forth at PSR ¶¶ 6-15.

1

As set forth in the report of examining psychologist Dr. Lines:

> Mr. Pippert was repeatedly sexually abused by two adolescent neighbor boys over a period of three or four years beginning when he was nine; the adolescent boys were 14 or 15 when the abuse began. The abuse started with the older boys leading him into swimming and sunbathing while naked, or taking him to a barn on one of their properties. It began with supposedly casual touching. For instance, one of the boys while reaching for a soda would touch his genitals. "I thought it was weird but I went with it, I just ignored it," he said. He said the sexual activities happened a few times per week in the summertime, less frequently during the school year. The abuse evolved to include masturbation, oral sex and penetration. He stated the boys rationalized the activities as normal. Because they were older, he looked up to them, so he believed them when they said, "Everyone is doing it."

Lines Report at 4. Mr. Pippert did not disclose the abuse to his parents and had not discussed it with anyone prior to these legal proceedings. *Id.* The marital trouble between Mr. Pippert's parents, as well as his mother's developing alcoholism, may help explain how his parents either did not notice or otherwise failed to respond to the effects of this abuse. *See* PSR ¶ 47.

Dr. Lines offers a "clinical opinion that there is a causal link" between Mr. Pippert's "experiences of sexual molestation at the hands of two older adolescent boys and his compulsion to produce child pornography." *Id.* at 5. Specifically, Dr. Lines finds that Mr. Pippert "unconsciously identified with the abusing boys and their sexual activities." *Id.*

> A common psychological sequela to abuse in childhood is termed *identification with the aggressor*. Following such abuse children who are abused tend to inflict the abuse on others. If physically abused, they are more likely to be start fights; if sexually abused, they are more likely to engage in inappropriate sexual activity with others. I suggest that this identification was at play from the start of Mr. Pippert's interest in child pornography through to the phase in which he committed an actual contact offense in producing the child pornography he is charged with producing. One factor substantiating this finding is the fact that Mr. Pippert considers himself to be heterosexual and interested in women as romantic and sexual partners. Why, then, would he seek images of young men? I suggest this was his seriously flawed attempt at working through the trauma he experienced in being repeatedly sexually abused by his adolescent perpetrators, by compulsively looking at pornographic images reminiscent of his abusers and by photographing himself having sex with an under-aged boy.

*Id.* Notably, the victim in this case, J.H. was approximately the same age as adolescent boys who sexually abused Mr. Pippert as a child. *See* PSR ¶ 13. This fact additionally supports the connection drawn by Dr. Lines between the abuse suffered Mr. Pippert and his conduct in the instant case.

2

The sexual abuse suffered by Mr. Pippert also contributed to the compulsive nature of his conduct in amassing staggering quantities of child pornography – over 400,000 images – one of the largest collections ever seen by the FBI agent in this case.  *See* PSR ¶ 15.

> Another psychological feature following exposure to abuse can be found in Mr. Pippert's offense conduct, which is the repetitive compulsivity involved in his use of child pornography and in making a video of his sexual activity for later compulsive viewing.  Turning again to the analogy of children who have suffered abuse, child therapists working with such children in therapy have reported a phenomenon called posttraumatic play with such children.  It is perhaps common knowledge that children in therapeutic settings usually engage in play therapy, because of their limited language skills relative to adults, with therapists offering toys and games as a way to access children's inner lives.  However, when treating children in psychotherapy who have suffered physical or sexual abuse, play themes are driven and repetitive.  Children who have been physically abused often show aggressive play themes—dolls who beat up other dolls relentlessly, for instance.  Similarly, children who have been sexually abused often manifest sexual acting out in their play themes, such as staging play scenes in which dolls sexually abuse one another.  Such children, whether abused physically, sexually or both, may also seek sexual or aggressive contact with other children who don't want such contact.  This posttraumatic play is impressive not only for its disturbing content, but also for its driven, repetitive compulsivity.  Furthermore, ordinary play seen from non-abused children endeavors to work through issues toward resolution, such as dolls that fight and then make up.  By contrast, posttraumatic play shows no such resolution: the same abuse in their play themes happens again and again, over and over, until the therapist interrupts it.  Very little working through of psychological issues is seen, only driven, compulsive repetition.
>
> In my experience forensically evaluating adult men and women who view, possess and/or produce child pornography, this factor of posttraumatic compulsivity is a repeatedly seen feature, and is a feature in Mr. Pippert's offense conduct.  The individual feels compelled to engage with this material, often without much pleasure, over and over again, while the motivation behind this activity—to work through the trauma suffered in being sexually abused—remains outside of their conscious awareness until the behavior is stopped and the individual is given help in understanding the behavior's underpinnings.  For instance, I once evaluated a man who was sexually abused as a 13-year-old by a much older adult; he was arrested for being in possession of child pornography of 13-year-old boys being abused by older men.  When asked why he would seek such material, he responded, "I wanted to see what happened to me."  While Mr. Pippert didn't use these words, he indicated his growing awareness of the connection between his past victimization and his offense conduct.

Lines Report at 5-6.

Further supporting the conclusion that the driver of Mr. Pippert's conduct was his unmet need to comes to terms with his own abuse, the evidence in this case shows that, while Mr.

Pippert collected vast quantities of child pornography, there is no indication that he ever shared his images with anyone else. PSR ¶ 15. Thus, the prolonged sexual abuse inflicted upon Mr. Pippert as a child had a direct effect upon the charged conduct in this case. Fortunately, as discussed in Part II below, the identification of this causal link actually reduces the risk of recidivism by Mr. Pippert in the future.

**II.   MR. PIPPERT POSES A LOW RISK OF RECIDIVISM UPON RELEASE**

The leading psychometric test designed to measure risk of sexual recidivism, the Static 99-R, was administered to Mr. Pippert by state authorities in connection with this case in 2016. PSR ¶ 57. Notwithstanding the seriousness of his conduct, Mr. Pippert scored a 3, which places him in the low-moderate risk category. *Id.* In the clinical judgment of Dr. Lines, the actual risk of recidivism by Mr. Pippert is in fact even lower than that.

As an initial matter, Dr. Lines notes that Mr. Pippert's age of 65 years at release following a 15-year term of imprisonment itself suggests a lower risk of recidivism.

> The analysis of sexual recidivism is best accomplished through a combination of psychometric tools designed to measure recidivism and clinical judgment of the assessor. Mr. Pippert was administered the standard test for measuring sexual recidivism, the Static 99-R, in conjunction with his state case in 2016. He scored 3 on this measure, placing him in the low-moderate risk category for engaging in another sexual offense post-release. I would suggest that his risk upon release will actually go down, because one of the factors measured is age at release from custody; sexual recidivism is thought to decrease with increasing age. Given that the court is obligated to meet a mandatory minimum sentence of 15 years, and the fact that Mr. Pippert will be just shy of 50 years old at sentencing, he will be about 65 years old at release, thus presenting less of a risk of re-offending.

Lines Report at 8.

In addition, Dr. Lines points to Mr. Pippert's own emerging understanding of the connection between his criminal conduct and the abuse he suffered as a child as further reducing the risk of recidivism, particularly in light of the treatment that he will receive in BOP custody and on supervised release.

> Regarding my clinical judgment of his recidivism risk, I found that Mr. Pippert is beginning to reflect on his actions in a way he hasn't prior to this adjudication. He is able to make the connection between his sexual victimization and his offense conduct. He also is learning about the psychological underpinnings of his longstanding drug problems. He is interested in ongoing drug treatment in

4

> custody and in examining his sexual compulsivity through whatever means the Bureau of Prisons has to offer. All of these factors will contribute to reducing his risk of re-offending.
>
> Finally, this man voluntarily expressed genuine remorse and thoughtfulness regarding his conduct. He said, "I have a lot of remorse over this now, I regret doing it." When I asked him why, he said, "I hurt the victim, just by the abuse." How did he hurt the victim? "Because they didn't have a say-so in it, at the beginning at least. It wasn't right. And I realize looking at porn is violating those people again. I feel guilty about it. If I could do it all over again, I wouldn't have done it."

*Id.* at 8-9. For these reasons, Mr. Pippert presents a low risk of reoffending. Accordingly, the Court need not extend the prison term in this case beyond what is otherwise an appropriate punishment, simply for the sake of mitigating the already low risk of future harm to society.

### III. STATE COURT PROSECUTION AND SENTENCE ON SAME CONDUCT

Prior to being charged in federal court in the instant case, Mr. Pippert was convicted and sentenced to a term of 32 months imprisonment *on the same course of conduct* in state court. PSR ¶ 36.[2] The government then waited until Mr. Pippert had fully served that sentence before prosecuting him in federal court, denying him the opportunity to request that his federal sentence run concurrently with his state sentence. Both of these factors are well-established bases to reduce Mr. Pippert's sentence below the otherwise applicable guideline range.

A. <u>Overstatement of Criminal History Category</u>

Apart from the instant case, Mr. Pippert has only one prior criminal conviction in the last 22 years, that is simple possession of "dangerous drugs" in Montana in 2007, prosecuted upon the completion of his state sentence in California in 2017. PSR ¶¶ 4; 35-37.[3] That

---

[2] The structure of the Presentence Report is vague on this point, artificially dividing the "background information" that first led to the state prosecution from the "instant offense." *Compare* PSR ¶¶ 6-10 *with* ¶¶ 11-15. Nevertheless, it is clear from the information presented in the PSR that the same state authorities (specifically, Fort Bragg police officers) involved in the "background information" also investigated the "instant offense" encompassed by the charges in federal court, and that the state prosecutors were fully aware of the entire scope of Mr. Pippert's conduct in the "instant offense" when he was charged, convicted and sentenced there. *See* PSR ¶¶ 11-15; *cf.* PSR ¶ 36.

[3] In fact, that 22 year-old case, theft in 1996, was subsequently dismissed in 1999 following Mr. Pippert's successful completion of a deferred sentencing program. PSR ¶ 35. The next

5

conviction results in one criminal history point, placing Mr. Pippert in Criminal History Category I.  *See* USSG Ch. 5 Pt. A (Sentencing Table).  Nevertheless, the PSR calculates Mr. Pippert to be in Criminal History Category III because it adds three more criminal history points from his 2016 child pornography conviction in state court, which is based on the same investigation and course of conduct as the instant federal case.  *See* PSR ¶¶ 36; 39-40.  While mathematically correct, it is respectfully submitted that this calculation results in an overstatement of Mr. Pippert's actual criminal history.

The Supreme Court recently granted certiorari to consider whether to reverse the long-standing rule that a prosecution in federal court following a conviction in state court for the same offense does not violate the Double Jeopardy Clause.  *See United States v. Gamble,* 694 Fed. Appx. 750, 750-51 (11th Cir. 2017), *cert. granted* 138 S. Ct. 2707 (June 28, 2018).  While *Gamble* is not directly on point here, since the charges in state court differ by at least one element from the charge here in federal court, the animating principal of the Double Jeopardy issue still retains force.

As such, even if Mr. Pippert may constitutionally be prosecuted and sentenced in federal court for the same course of conduct that he has already been prosecuted and sentenced for in state court, the sentence from the state court case should not be used to increase his Criminal History Category from I to III, just because he happened to be prosecuted in state court first.   A downward departure along these lines due to overstatement of criminal history is expressly authorized by USSG § 4A1.3(b).  Alternatively, the Court may grant a downward variance under 18 U.S.C. § 3553(a)(1).  Based on Criminal History Category I and Total Offense Level 35, Mr. Pippert's applicable guideline range is 168 to 210 months, with a mandatory minimum here of 180 months.

B. <u>Denial of Opportunity to Seek Concurrent Time on State and Federal Sentences</u>

A reduced sentence on this basis is further supported by the fact that Mr. Pippert was denied the opportunity to seek concurrent time on his state and federal sentences.  As noted

---

most recent criminal conviction was uttering and publishing in 1989 when Mr. Pippert was just 19 years old.  *Id.* ¶ 34.

above, Mr. Pippert was convicted and sentenced to 32 months imprisonment in state court on July 20, 2016, for the same course of conduct underlying the instant federal case. PSR ¶ 36. At that point, the government could have commenced the instant federal prosecution against Mr. Pippert and brought him here by writ of habeas corpus ad prosequendum. Instead, Mr. Pippert was not brought to federal court until November 14, 2017, after he had fully served the 16 months in custody to complete that sentence. This delay denied Mr. Pippert the opportunity to seek concurrent rather than consecutive prison time on these two related cases.

The Ninth Circuit has long recognized that this circumstance is a proper basis for reduction of a sentence under the U.S. Sentencing Guidelines. *See United States v. Sanchez-Rodriguez,* 161 F.3d 556, 564 (9th Cir. 1998) (en banc) (approving downward departure "based on time already served in state court, or the lost opportunity to serve more of one's state term with one's federal term"). Again, whether framed as a downward departure under the Guidelines or a downward variance under the factors of 18 U.S.C. § 3553(a), this fact further supports a reduction in Mr. Pippert's sentence to 180 months imprisonment.

## IV. SPECIAL ASSESSMENT SHOULD BE $100 BECAUSE PIPPERT IS INDIGENT

Without explanation, the U.S. Probation Officer recommends that the Court charge Mr. Pippert a special assessment of $5100 on the sole count of conviction rather than the usual $100. *See* PSR Recommendation at 1, 3, 5. The charge here does authorize such an enhanced special assessment for "any non-indigent person or entity." 18 U.S.C. § 3014. However, it is clear that Mr. Pippert is indeed indigent. As an initial matter, he qualified for appointment of counsel. Moreover, based upon a detailed review of Mr. Pippert's financial circumstances, the PSR explicitly states that "it does not appear as though he has the ability to pay a fine." PSR ¶ 69. Accordingly, the Court should impose a special assessment of $100 rather than $5100.

## V. COMPUTER-RELATED SUPERVISED RELEASE CONDITIONS

Finally, a slight rewording of two proposed supervised release conditions addressing the use of computers is respectfully requested. The PSR includes six proposed conditions of supervised release relating to computers:

/ / /

7

4. You must submit your person, residence, office, vehicle, electronic devices and their data (including cell phones, computers, and electronic storage media), or any property under your control to a search. Such a search must be conducted by a United States Probation Officer or any federal, state or local law enforcement officer at any time with or without suspicion. Failure to submit to such a search may be grounds for revocation; you must warn any residents that the premises may be subject to searches.

5. You must not possess or use a computer without the prior approval of the probation officer. "Computer" includes any electronic device capable of accessing the internet or processing or storing data as described at 18 U.S.C. § 1030(e)(1) (including cell phones), and all peripheral devices.

6. As directed by the probation officer, you must enroll in the probation office's Computer and Internet Monitoring Program (CIMP) and must abide by the requirements of the CIMP program and the Acceptable Use Contract.

7. You must not access the Internet or any "on-line computer service" at any location (including employment) without the prior approval of the probation officer. "On-line services" include any Internet service provider, or any other public or private computer network. As directed by the probation officer, you must warn your employer of restrictions to your computer use.

8. You must consent to the probation officer conducting periodic unannounced examinations of your computer equipment which may include retrieval and copying of all data from your computer(s) and any peripheral device to ensure compliance with this condition, and/or removal of any such equipment for the purpose of conducting more thorough inspection. You must also consent to the installation of any hardware or software as directed by the probation officer to monitor the defendant's Internet use.

9. You must not possess or use any data encryption technique or program.

PSR Recommendation at 4.

    Clearly, there must be tight controls over, and clear accountability for, all computer use by Mr. Pippert while on supervised release.  However, it is respectfully submitted that, given the ubiquitous necessity of using a computer to get along in contemporary society, which can only be expected to increase over the next 15 years, the proposed conditions written flatly in the negative – "You must not possess or use a computer" and "You must not access the Internet, or any 'on-line computer service' at any location (including employment)" – are unreasonable.  Nor does it suffice that these proposed conditions as written do grant the

probation officer vague standardless discretion nevertheless to approve such activities. *See, e.g., United States v. Evans,* 883 F.3d 1154, 1164 (9th Cir. 2018) (reaffirming that a "vague supervised release condition cannot be cured by allowing the probation officer an unfettered power of interpretation, as this would create one of the very problems against which the vagueness doctrine is meant to protect, *i.e.,* the delegation of basic policy matters to policemen for resolution on an ad hoc and subjective basis") (citations and internal quotation marks omitted).

Accordingly, it is respectfully requested at a minimum that proposed conditions 5 and 7 be amended as set forth below to reverse the presumption regarding whether a computer and the Internet may be used at all, while maintaining the requirement for prior approval by the probation officer:

  5. ~~You must not possess or use a computer~~ **Any and all computers used or possessed must meet with** the prior approval of the probation officer, **which approval shall not be unreasonably withheld**. "Computer" includes any electronic device capable of accessing the internet or processing or storing data as described at 18 U.S.C. § 1030(e)(1) (including cell phones), and all peripheral devices.

  \* \* \*

  7. ~~You must not~~ **Any and all** access ~~to~~ **of** the Internet or any "on-line computer service" at any location (including employment) ~~without~~ **must meet with** the prior approval of the probation officer, **which approval shall not be unreasonably withheld**. "On-line services" include any Internet service provider, or any other public or private computer network. As directed by the probation officer, you must warn your employer of restrictions to your computer use.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

9

**CONCLUSION**

For the aforementioned reasons, the Court should sentence Mr. Pippert to a term of 180 months imprisonment, 10 years supervised release with proposed conditions as amended, and a special assessment of $100.

Respectfully submitted,

Dated:   September 25, 2017

STEVEN KALAR
Federal Public Defender
Northern District of California

                /S
DANIEL P. BLANK
Assistant Federal Public Defender